UNITED STATES of America,

v.

George TUCKER, Defendant.

No. CR 80–00065.

United States District Court,
E. D. New York.

July 23, 1980.

E. R. Korman, U. S. Atty-E.D.N.Y., Brooklyn, N. Y. by John H. Jacobs, Exec. Asst. Dist. Atty., Organized Crime Strike Force, New York City, for U. S.

Giblin & Giblin by Richard J. Abrahamsen, Hackensack, N. J., for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

In a four-count indictment filed February 7, 1980, defendant George Tucker has been charged with making false declarations before a grand jury, in violation of 18 U.S.C. § 1623, and with various acts of obstructing justice, in violation of 18 U.S.C. §§ 873, 1503, and 1510.[1]

Defendant has moved to dismiss all or parts of various counts of the indictment on the following grounds.

(1) He seeks dismissal of count 1, the false declarations count, on the ground that prosecution under § 1623 is barred by his purported recantation at a subsequent grand jury appearance and the operation of § 1623(d); on this point he also asserts that he is entitled to an evidentiary hearing at which the proof must be beyond a reasonable doubt.

(2) He seeks dismissal of the entire indictment on the ground that the indictment was returned by the same grand jury that heard his testimony on the occasion at which the alleged false declarations occurred and on the occasion of his claimed recantation; he asserts that he testified under immunity on both occasions, and that, consequently, the latter testimony cannot be used against him in this prosecution.

(3) He argues that the first three questions and answers and the last question and an-

---

1. 18 U.S.C. § 1623(a) provides in pertinent part: "Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C. §§ 873, 1503, and 1510 deal with, respectively, blackmail, influencing or injuring witnesses generally, and obstruction of criminal investigations. These counts stem from and are related to defendant's alleged attempts to conceal the alleged false declarations before a grand jury which underlie the § 1623(a) count.

swer of the six alleged in count 1 to have been false must be stricken from the indictment on the ground that the answers were literally true.

(4) Finally, he contends that count 1 must be dismissed inasmuch as the questions posed were not material to the Government's investigation.

■ After a full briefing of these issues by the parties and oral argument, at which summary disposition was made of some of these and of other marginal issues,[2] the Court reserved decision. For the reasons stated below, we now deny defendant's remaining motions without a hearing.

### I

Defendant's grand jury appearances stemmed from his involvement in the manufacture and interstate distribution of counterfeit tape recordings of copyrighted musical works by various well-known artists. That involvement led to an earlier indictment in this district for eleven counts of copyright infringement, 17 U.S.C. §§ 106(1), (3), 506(a), nine counts of interstate wire fraud, 18 U.S.C. § 1343, and one count of participating in a pattern of racketeering activity, 18 U.S.C. § 1962(c).[3] On

August 31, 1979, defendant entered a plea of guilty to two counts of the indictment— one wire fraud count and one misdemeanor copyright infringement count—pursuant to a Rule 11(e), *Fed.R.Crim.P.*, agreement with the Government.

Defendant appeared before this Court for sentencing on November 21, 1979, at which time he made to the Government an offer of "unrestricted" cooperation in the continuing investigation into interstate trafficking in counterfeit records and tapes. Although the Government initially balked at the offer,[4] this Court nonetheless adjourned sentencing until early January, 1980, so that any cooperation then forthcoming could be duly weighed.

Soon thereafter, the Government received independent information from a confidential informant that defendant had had a business relationship with one Norton Verner. Central to this relationship was defendant's alleged practice of manufacturing counterfeit eight-track tapes and selling them to Verner, who in turn would allegedly act as "middleman" in selling them to various retail outlets. Defendant had revealed nothing to the Government, either as part of his offer of cooperation or otherwise, about his relationship and dealings

2. Defendant sought an order requiring the Government to turn over at this time any material in its possession on Norton Verner, a central figure in this prosecution, as will be seen *infra*, pursuant to 18 U.S.C. § 3500 and the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Government has indicated that it has only impeachment, not exculpatory, material with respect to Verner and that it will be turned over to the defendant at the commencement of his trial. Neither the case law nor § 3500 require the Government to turn over such material at the time of pretrial motions. *See, e. g., United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n. 1 (2d Cir. 1974), *cert. denied*, 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975). Moreover, *United States v. Sebastian*, 497 F.2d 1267 (2d Cir. 1974), and *United States v. Covello*, 410 F.2d 536 (2d Cir. 1969), both construe the word "trial" in § 3500 to mean just that and only that.

Additionally, defendant moved to disqualify the prosecutor in this case, John H. Jacobs, Esq., of the Organized Crime Strike Force for this district, on the ground that his submission of an affidavit in opposition to the motions addressed here made him a "witness." We deny this out

of hand. Mr. Jacobs' affidavit did not make him a "witness" of the type contemplated by Disciplinary Rule 5–102(A) of the A.B.A. *Code of Professional Responsibility* and the cases relied on by defendant. These only prohibit the prosecutor actually taking the stand and testifying at trial, which Mr. Jacobs has indicated he has no intention of doing (ironically, also by way of affidavit; Affidavit in Opposition to Defendant's Motion to disqualify John H. Jacobs, at ¶ 2). *See United States v. Alu*, 246 F.2d 29 (2d Cir. 1957); *United States v. Treadway*, 445 F.Supp. 959 (N.D.Texas 1978).

3. It also led to an opinion of this Court dealing with various suppression and other pretrial motions related to the earlier indictment. *United States v. Tucker*, 481 F.Supp. 182 (E.D.N.Y. 1979) (Platt, J.).

4. The Government's position was that the extent of cooperation proffered, both at the November 21 appearance and in a letter dated November 6 from defendant's counsel to the prosecutors, was still too "limited." *See* Jacobs Affidavit, at 1, ¶ 2 and 2, ¶ 4.

with Verner. Affidavit of John H. Jacobs, Executive Assistant, Organized Crime Strike Force for the Eastern District of New York, at 2, ¶¶ 4–6 [hereinafter "Jacobs Affidavit"].

Acting on this information, and seeking to make some use of defendant's offer to cooperate, the Government put defendant before the grand jury on December 6, 1979. The Government asserts that this appearance was central to its effort to "make a case" against Verner for his alleged sales of counterfeit tapes manufactured by defendant to Sam Goody, Inc., a retailer also currently under indictment in this district for counterfeit tape interstate transportation and distribution.[5] Jacobs Affidavit at 2, ¶ 7. On the basis of this information linking Verner to Sam Goody, Inc., also supplied by the Government's confidential informant, and truthful testimony from defendant, the grand jury could have indicted Verner on that date, the Government asserts. *Id.*

Instead, the instant indictment alleges, defendant lied to the grand jury about his relationship with Verner. Testifying under informal "use" immunity, defendant gave the following responses to the following questions put to him at the outset of his appearance:[6]

[1] "Q Do you know someone by the name of Norton Verner?

A Yes, sir.

[2] Q Can you tell the jury who that person is?

A He is a man who owns a marina out in Long Island that I have been friendly with for about three or four years. He is in the music business for a lot of years. That is my only relationship with Mr. Verner.

[3] Q Is he just a friend?

A Yes, sir, that is all he is.

[4] Q Have you ever dealt with him in connection with the music business?

A No.

[5] Q Have you ever sold him products?

A No.

[6] Q Have you ever gotten products from him?

A No, sir.

Indictment CR 80–65, Count 1, ¶ 4. The indictment goes on to allege that the above testimony was false in that Verner met defendant on at least ten occasions to purchase at least 60,000 counterfeit tapes for approximately $80,000. *Id.* ¶ 5.

At his own request, defendant appeared before the same grand jury on January 3, 1980, to attempt to recant the relevant portion of his previous testimony pursuant to § 1623(d). This time he testified under a "waiver of immunity," that is, according to the Government, with full understanding that anything he testified to could be used against him in a prosecution for perjury or contempt. Grand Jury Minutes, Jan. 3, 1980, at 2. He stated, in response to proper questioning, that his answers to questions 2 through 5 above had been false.

## II

Section 1623(d) provides in full as follows:

"Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section [§ 1623(a)] if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

This section, enacted as part of the Organized Crime Control Act of 1970, Pub.L. 91–

---

**5.** Indictment No. CR 80–00095 charges Sam Goody, Inc., its President, George Levy, and a Vice President, Samuel Stolon, with three counts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, one count of participating in a pattern of racketeer-

ing activity in violation of 18 U.S.C. § 1962, and twelve counts of separate misdemeanor copyright infringement violations.

**6.** The questions are numbered to facilitate reference in the discussion to follow.

452, Title IV, § 401(a), 84 Stat. 932, was intended to serve "as an inducement to [a] witness to give truthful testimony by permitting him voluntarily to correct a false statement without incurring the risk [of] prosecution by doing so." [1970] *U.S. Code Cong. & Admin.News,* pp. 4007, 4023, 4024; *United States v. Del Toro,* 513 F.2d 656, 665 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). As such, it marked a departure from prior federal law, which had long held that the crime of perjury was complete as soon as the false statement was made, *United States v. Norris,* 300 U.S. 564, 57 S.Ct. 535, 81 L.Ed. 808 (1937), and that a subsequent recantation was only relevant to the extent that it showed the lack of intent to commit perjury.[7] *See United States v. Kahn,* 472 F.2d 272, 283 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). We note that the latter is still the law with respect to the general perjury statute, 18 U.S.C. § 1621, which § 1623 was meant to "supplement, not supplant," and then only with respect to false statements before courts and grand juries.[8] S.Rep. 91–617, 91st Cong., 2nd Sess. 109 (1969); *see Kahn, supra,* 472 F.2d at 283 n. 8.

The act of recantation, standing alone, is not a complete bar to prosecution under § 1623(d), however. The section contains a two-pronged timeliness requirement which must be satisfied at the time recantation is made. Prosecution is barred only if, at the time of recantation, the false statement "has not substantially affected the proceeding, or"—and the "or" is critical to a proper construction of the section—"it has not become manifest that such falsity has been or will be exposed." Since there is no dispute here that the other elements of § 1623(d) are satisfied—defendant clearly did admit that his prior testimony was false, and he

did so in the "same continuous . . . grand jury proceeding"—the only major issue with respect to his first motion is whether the two-pronged timeliness requirement has been met.

Defendant argues that the Government must prove beyond a reasonable doubt that his recantation was too late in both respects before the prosecution may proceed. That is, the Government must prove that the grand jury proceeding had been substantially affected *and* that it had become manifest that his false statements had been or would be exposed. He bases this position on the plain meaning of the section and the argument that the express legislative intent would be frustrated if only the first part of the requirement need be satisfied and not the second, inasmuch as the first is a matter wholly within the knowledge of the Government. No witness, he argues, would be induced to recant if he could only do so if he knew that the grand jury had not been substantially affected, a matter which he would have no way of knowing in view of the secrecy which surrounds grand jury proceedings.

The Government responds by asserting that no case law supports the proposition that the section requires the satisfaction of both conditions before prosecution may proceed. In addition, the Government also relies on the plain meaning of the section, focusing simply on the use of the disjunctive "or." Further, the Government argues that the proper standard of proof for the determination of whether either condition has been satisfied is a fair preponderance of the evidence, not proof beyond a reasonable doubt.

Despite the strenuous arguments of counsel for both sides, we need not decide

---

7. Section 1623(d) was modeled after New York Penal Law § 210.25 (McKinney's 1980) which, however, differs from § 1623(d) in two material respects; recantation is labeled an "affirmative defense," rather than an outright bar to prosecution, as in § 1623(d); and it uses the conjunctive "and" where § 1623(d) uses the disjunctive "or" to link the two elements of the timeliness proviso. *See People v. Ezaugi,* 2 N.Y.2d 439,

161 N.Y.S.2d 75, 141 N.E.2d 580 (1957); *see also* [1970] U.S. Code Cong. & Admin.News p. 4024.

8. The general perjury statute, § 1621, covers false testimony under oath before any "competent tribunal, officer, or person." *See generally United States v. Kahn, supra,* 472 F.2d at 283 and n. 8.

whether the elliptical wording of the timeliness provision requires the Government to show that just one or both elements were not satisfied by defendant. As will be shown below, we are able to make findings in favor of the Government on both points, making it unnecessary to engage in speculation as to what meaning should be attached to § 1623(d)'s confusing combination of double negatives, the conditional word "if", and the disjunctive "or".

■ With that point eliminated, the next question is by what standard the Government must prove that defendant's recantation was untimely on both counts, and whether a hearing is required. Because recantation is a "bar" to prosecution rather than an affirmative defense, the timeliness of the recantation here is properly before us on a pretrial motion. *See United States v. Kahn, supra,* 472 F.2d at 283 n. 9. It is clear that rulings on pretrial motions in criminal cases need be based only on a fair preponderance of the evidence, not evidence beyond a reasonable doubt. *Lego v. Twomey,* 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). We note, as did the Court in *Lego supra,* that the reasonable doubt standard is reserved for the consideration by the trier of fact of the actual elements of the offense charged. In this case, defendant will have the full panoply of constitutional protections, including the reasonable doubt standard, at his trial. It is at trial, not on this preliminary motion, where the jury will make the final decision on the timeliness of defendant's recantation, and will do so on the basis of the reasonable doubt standard. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■ In addition, no hearing is required to enable us to decide this motion by a fair preponderance of the evidence. Although the affidavits submitted by defendant and his past and present counsel do raise some factual issues when contrasted with the Jacobs affidavit for the Government, the differences are either inconsequential or minimal enough to allow us to decide the issues on the basis of the affidavits and the arguments of counsel. On the basis of these presentations, we find that the Government has amply demonstrated that defendant's recantation under § 1623(d) was untimely, in that the grand jury had been substantially affected and the falsity of defendant's earlier testimony had become manifest by the time he attempted to recant on January 3d.

■ The Government has shown that the grand jury was substantially affected in that it was unable to indict Verner when it otherwise could have because of defendant's alleged false statements. Moreover, Verner then had to be given immunity for his testimony against defendant leading to the instant indictment, and for any testimony he was about to give concerning Sam Goody, Inc. and other retailers. Defendant responds by asserting that the Government had more than enough evidence on which to predicate an indictment of Verner as early as 1978, and that the Government did not reluctantly drop the idea of prosecuting Verner after defendant's first grand jury appearance. Rather, he argues, the final decision not to prosecute, formalized by an immunity letter, resulted from Verner's decision to testify against Sam Goody, Inc. at the latter's trial, and had nothing to do with whatever may have been said to the grand jury.

■ We credit the Government's position, inasmuch as it is in the best position to know the basis for its decisions regarding prosecution of Verner. These decisions, we might add, are properly within the discretionary domain of the Government, not this Court or the defendant. We accept the Government's argument that the grand jury was substantially affected when it heard Verner's immunized testimony, regardless of the discretionary decisions which underlay his grant of immunity. As the court said in *United States v. Krogh,* 366 F.Supp. 1255, the Government is entitled to a presumption of a substantial affect when the grand jury "acts" prior to an attempted recantation:

"As a matter of law such [false] statement[s] must be presumed to have been considered by the Grand Jury and to have substantially affected the proceedings where the Grand Jury has subsequently acted. Section 1623(d) does not contemplate a detailed inquiry into the thought processes of Grand Jurors."

366 F.Supp. at 1256. Nor does it contemplate a "detailed inquiry" into the exercise of discretion by the prosecutors. The grant of immunity to Verner and his subsequent testimony are enough for us to base a finding that the grand jury had been substantially affected by defendant's allegedly false testimony at his first appearance.

We further find that it had become manifest to both the Government and to defendant that his alleged false statements had been exposed before his recantation. It is uncontroverted that the alleged falsity had been exposed to the Government by way of Verner's intervening immunized testimony. See United States v. Kahn, supra, 472 F.2d 272 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). And it is apparent that imminent exposure of the falsity had become manifest to defendant because of his conversations with Verner after defendant's first appearance. The better view of the "manifest" element of § 1623(d) is that it applies specifically to the witness's knowledge, gained either from independent sources or from the prosecutor. United States v. Del Toro, supra, 513 F.2d 656 (2d Cir.), cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); United States v. Mitchell, 397 F.Supp. 166 (D.D.C. 1974); United States v. Krogh, supra, 366 F.Supp. 1255 (D.D.C.1973). Even if defendant did not gain knowledge of the exposure of the falsity from Verner, it is uncontroverted that he did gain it from the prosecutor, who told defendant's counsel immediately prior to defendant's recantation appearance that, in the Government's view, the appearance was "too late." Jacobs Affidavit at 4, ¶ 17.

■ Defendant asserts that his recantation was timely notwithstanding the above, because he made his "decision to recant" immediately after his first appearance. Even if true, however, this does not render the recantation timely. Section 1623(d) clearly states that the actual recantation must take place within the timeliness proviso. By linking the timeliness requirements to "the time the admission [of falsity] is made", the section makes the moment of decision to recant irrelevant to the determination of timeliness and the propriety of prosecution.

On the basis of the above, defendant's motion for dismissal of count 1 of the indictment and for a hearing thereon is hereby denied.

### III

Defendant next moves for an order dismissing the entire indictment on the ground that the same grand jury that heard his testimony on both December 6, 1979, and January 3, 1980, returned the indictment. Central to this motion is defendant's contention that he testified under immunity on both occasions. Alternatively, defendant seeks an order barring the use or derivative use of his January 3 testimony because, he argues, it was given under immunity.

■ Neither the cases nor the facts support defendant's position. In United States v. Hinton, 543 F.2d 1002 (2d Cir. 1976), cert. denied, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1977), and again in United States v. Anzalone, 555 F.2d 317 (2d Cir.), cert. denied, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1977), aff'd on rehearing 560 F.2d 492 (2d Cir. 1977), the Court of Appeals for this Circuit held that when an indictment is "the product of . . . immunized testimony, it must be dismissed so far as substantive offenses are concerned." Anzalone, supra, 555 F.2d at 319; see Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). A necessary corollary of this holding, expressed clearly in both cases, is that "false testimony given under use immunity may nevertheless become the predicate for a perjury or false declaration charge." Anzalone, supra, 555 F.2d at 319; Bryson v. United States, 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 64 (1969);

*Glickstein v. United States,* 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911). It is thus obvious that use immunity generally bars the "use" of the immunized testimony before the same grand jury for all but perjury and false declarations indictments. Consequently, the "same grand jury" rule of the above cases does not apply to count 1 of the indictment, the false declaration count, and we will not dismiss it on this ground.

■ The remaining substantive counts, alleging various acts of obstruction of justice, *see* fn. 1, *supra,* must survive for a different reason. In *United States v. Hinton, supra,* the court expressed an important limitation on the "same grand jury" rule when it stated that, "as a matter of fundamental fairness, a Government practice of using the same grand jury that heard the immunized testimony of a witness to indict him after he testifies, *charging him with criminal participation in the matters being studied by the grand jury,* cannot be countenanced." 543 F.2d at 1010 (emphasis added); *see United States v. Anzalone, supra,* 555 F.2d at 319. Indictments unrelated to the actual investigation for which an immunized witness testifies may thus be validly returned by the same grand jury.

■ In this case, it is apparent that at the time of defendant's first appearance on December 6th, the grand jury was not investigating possible obstruction of justice by this defendant. No questions were directed to defendant on that date bearing on his possible participation in these offenses; indeed, the only questions even remotely related to these offenses were the six questions about his business relationship with Verner, and these only sought information pertinent to the counterfeit recording investigation. The *Hinton-Anzalone* rule is clearly inapplicable to the substantive counts of the indictment because of this fact.

■ Moreover, we find that defendant did not testify under immunity, at least with regard to a possible false declaration charge, at his second appearance on January 3d. The grand jury minutes support the contention in the prosecutor's affidavit that defendant and his counsel were informed that defendant would have to testify under a "waiver of immunity," inasmuch as he had actively sought this second appearance to attempt to recant and he had been informed that he was now a target of the grand jury investigation because the falsity of his earlier testimony had become manifest through the testimony of witnesses in the interim. *See* Jacobs Affidavit at 4, ¶¶ 16–18. The pertinent portion of the grand jury minutes for January 3d is set forth in the margin.[9] The waiver of immunity makes this case factually distinguishable from *Hinton, supra,* and *Anzalone, supra,* as the Government vigorously contends. The defendant's voluntary testimony without immunity "cured" any possible defect under the *Hinton-Anzalone* rule which may have arisen at that appearance as a result of the investigation's shift to this defendant's possible perjury and obstruction of justice.

9. "MR. JACOBS [for the Government] . . . Before you are sworn in, Mr. Tucker, let me advise you of the following:

You appeared on December 6, 1979, as a witness before this grand jury. Before you appeared, you were explained what your legal status is before this grand jury.

I would like to once again repeat to you that you are now appearing before this grand jury under what we call a waiver of immunity. In other words, anything that you say here can be used against you in a sense that you can be prosecuted for perjury or contempt.

Do you understand that, sir?

"THE WITNESS: Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

"MR. JACOBS: Now in light of those two statements I have made [regarding the waiver of immunity and the recantation statute] to you, Mr. Tucker, do you wish to proceed with your grand jury testimony as I have just explained it to you?

"THE WITNESS: I would like to speak to my attorney for a moment.

\*　　\*　　\*　　\*　　\*　　\*

"MR. JACOBS: Mr. Tucker, have you had an opportunity to confer with your attorney?

"THE WITNESS: Yes.

"MR. JACOBS: Do you wish to proceed?

"THE WITNESS: Yes."

Grand Jury Minutes, January 3, 1980, at 2, 5, 7.

Defendant's motion to dismiss all counts of the indictment on the basis of the "same grand Jury" rule is therefore denied.

 Defendant's alternative application for an order barring use or derivative use of his January 3d testimony is also thereby rendered academic because we have found it to have been given without immunity. It is also clear now, since the Supreme Court's recent decision in *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed. 2d 250 (1980), that no restrictions need be placed on the use at trial of either his immunized December 6th testimony or his non-immunized January 3d testimony. The Court held that neither the Fifth Amendment nor the federal immunity statute, 18 U.S.C. § 6001 *et seq.,* bars the use of immunized or non-immunized testimony in a prosecution for perjury, and further that no distinction need be made between truthful and false testimony given under immunity. The whole of defendant's testimony is thus "fair game" for use at his trial, so long as it conforms to otherwise applicable rules of evidence.[10] *Id.* at 131, 100 S.Ct. at 957.

## IV

Defendant next moves for an order striking from count 1 of the indictment the first three questions and answers and the last of the six questions and answers on the ground that the answers were literally true. The Government has voluntarily offered to strike question and answer number 6 because the answer actually was true, leaving only questions one through three for our consideration.

Defendant relies on the rule enunciated in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), that the federal perjury statutes do not reach literally true but unresponsive answers, even if the witness intends to mislead his questioner and even if the answer is arguably untrue by negative implication.[11] *See also United States v. Corr,* 543 F.2d 1042, 1048–49 (2d Cir. 1976). Defendant contends that the answers to questions two and three were literally true because the questions were framed in the present tense ("Can you tell the jury who that person *is*?" "*Is* he just a friend?") and made no reference to past dealings with Verner, which defendant concedes to have occurred. Defendant argues that if the prosecutor found these answers unenlightening his remedy should not have been a perjury indictment but more precise questioning. As the Court stated in *Bronston,* the "questioner's acuity" should lead him "to press another question or reframe his initial question with greater precision" when the witness provides unexpected but literally truthful answers. "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States, supra,* 409 U.S. at 362, 93 S.Ct. at 602.

 The difficulty with defendant's argument is that he has conceded that the answers were not even literally true. At his second grand jury appearance, defendant admitted that the answers to both questions were false, clearly implying that the verb tense of the questions was immaterial and that defendant was still engaged in some sort of dealings with Verner. The

10. *Apfelbaum* overruled the line of cases on which defendant relied in his motion papers. Thus, the only remaining question may be whether *Apfelbaum* is properly applicable to defendant's testimony which occurred some months prior to March 3, 1980, the date the case was decided. We believe it is. First, nothing in the opinion indicates that the Court considered the holding to be a radical departure from prior law. Second, and related to the first, this court should generally operate on the presumption that we are to apply the law as we find it at the time of decision. Third, it would strain credulity to believe that defendant decided whether or not to perjure himself on the basis of the line of overruled cases, as his Memorandum of Law would have us believe.

11. *Bronston* arose from a prosecution under § 1621, the general perjury statute, but the rule of the case is generally agreed to apply with equal force in § 1623 cases. *See, e. g., United States v. Vesaas,* 586 F.2d 101 (8th Cir. 1977); *United States v. Slawik,* 548 F.2d 75 (3d Cir. 1977).

questions and answers which revealed these admissions are set forth in the margin.[12]

These admissions of falsity are all that the prosecutor needed to press for the instant indictment for a violation of § 1623. He need not have known with precision the extent of the falsity or what a completely truthful answer would have been. Defendant's own admissions established, at least *prima facie*, that his answers were both responsive and literally false. *Cf. United States v. Corr, supra*, 543 F.2d at 1049 (prosecution for perjury proper where answer is unresponsive, as long as it is false). On this basis, we have no trouble concluding that the entire series of questions and answers was properly alleged in the indictment. The ultimate determination of falsity, of course, is a matter for the jury at trial.

Defendant's motion to strike questions and answers one, two, and three from count 1 of the indictment is therefore denied.

### V

Defendant finally moves for an order dismissing count 1 of the indictment on the ground that the questions which elicited his allegedly false statements were not "material" to the grand jury investigation.

█ By the express terms of § 1623(a), the section "is contravened only when the perjury is committed in response to a question which bears upon the matters within the investigation's purview." *United States v. Berardi*, 629 F.2d 723, 727 (2d Cir. 1980); *United States v. Mulligan*, 573 F. 2d 775, 779 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978). The Government bears the burden on this "threshold issue which must be determined by the court," though materiality need not be shown beyond a reasonable doubt. *United States v. Berardi, supra*, at 728; *Sinclair v. United States*, 279 U.S. 263, 298–99, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929); *United States v. Giacolone*, 587 F.2d 5, 7 (6th Cir. 1978), *cert. denied*, 442 U.S. 940, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Mulligan, supra*, 573 F.2d at 779.

█ In *United States v. Berardi, supra*, the Court of Appeals for this Circuit has quite recently restated the test of "materiality" under § 1623(a). After noting the "wide-ranging investigative function of the grand jury," the court cautioned that "the materiality of its inquiries must be broadly construed." At 728; *see also United States v. Demauro*, 581 F.2d 50, 53 (2d Cir. 1978). The court then stated the "classic formulation" of materiality: "where the false declaration has 'a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation . . . .'" *United States v. Berardi, supra*, at 728, quoting *Carroll v. United States*, 16 F.2d 951, 953 (2d Cir.), *cert. denied*, 273 U.S. 763, 47 S.Ct. 477, 71

---

**12.** "MR. JACOBS: Mr. Tucker, let me ask you this, sir:

You were asked the following questions by Mr. Sayah [the Assistant United States Attorney who asked the questions at defendant's December 6th appearance], commencing on page 5 [of the December 6th minutes]. You were asked the following question:

'Do you know someone by the name of Norton Verner, V–E–R–N–E–R.'

Your answer was 'Yes, sir.'

'Question: Can you tell the grand jury who that person is?

Answer: He is a man who owns a marina out in Long Island that I have been friendly with for about three or four years. He is in the music business for a lot of years. That is my only relationship with Mr. Verner.'

Do you recall being asked that question and giving that answer?

"THE WITNESS: I believe so, Mr. Jacobs.
"MR. JACOBS: Was that answer truthful, sir?
"THE WITNESS: No.
"MR. JACOBS: Do you recall being asked the following

'Question: Is he just a friend?

Answer: Yes, sir, that is all he is.'

Do you recall being asked that question and giving that answer, sir?

"THE WITNESS: No, but if it is in the record, I am sure I answered it that way.
"MR. JACOBS: That answer that you just heard, is that false, sir? That he was just a friend?
"THE WITNESS: As opposed to what? As opposed to a business associate?
"MR. JACOBS: That's correct.
"THE WITNESS: The answer is false."
Grand Jury Minutes, January 3, 1980, at 9–10.

L.Ed. 880 (1927). The court elaborated on the formulation with the following:

> "Materiality is thus demonstrated if the question posed is such that a truthful answer could help the inquiry, or a false response hinder it, and these effects are weighed in terms of potentiality rather than probability. Thus, in applying this gauge to specific situations, it is only the question, at the time of its asking, which is considered. It is of no consequence that the information sought would be merely cumulative, . . . or that the matters inquired into were collateral to the principal objective of the grand jury."

*United States v. Berardi, supra,* at 728 (citations omitted).

■ Applying this broad test to the situation before us, we have no trouble finding that the questions which elicited defendant's allegedly false answers were material to the grand jury's investigation into sales of counterfeit sound recordings by certain individuals to retail outlets. Upon consideration of the grand jury minutes of December 6, 1979, and the prosecutor's affidavit, both of which are properly before us, *see United States v. Berardi, supra,* at 728, we find that defendant's answers— particularly his categorical denial of ever dealing with Verner in connection with the music business—had a "natural effect to impede" the grand jury's investigation. Not the least significant effect was the inability of the Government to seek an indictment of Verner because of defendant's answers. Jacobs Affidavit at 2, ¶ 7. Another effect, of course, was that the investigation was delayed in that the Government then had to secure immunity for Verner and reshape the investigation to pursue his testimony instead of defendant's.

■ Defendant has proffered three reasons why the questions and answers were not material, all of which may be dispensed with briefly: (1) the information sought was already known to the Government; (2) defendant could not be indicted because he testified under informal "use" immunity; and (3) this district was an improper venue for an investigation into defendant's dealings with Verner because defendant's place of business was in New Jersey. As to the first, the prosecutor has stated under oath that the Government's only information about Verner's possible involvement with defendant and various retailers came from a confidential informant just a few days prior to defendant's first grand jury appearance. Jacobs Affidavit at 2, ¶ 5. The informant had not yet testified before the grand jury, *see id.* at 3 ¶ 14, and defendant was to be the first and principal witness to Verner's status as the "middleman" in any counterfeit recording conspiracy. Even if other witnesses had already testified and even if the Government already had a good idea what defendant's answers should have been, defendant's answers were material because "[i]t is of no consequence [to the determination of materiality] that the information sought would be merely cumulative." *United States v. Berardi, supra,* at 728; *see United States v. Richardson,* 596 F.2d 157 (6th Cir. 1979).

As to defendant's second argument, it should suffice to say that the Government's inability to indict defendant because of his "use" immunity does not give him license to make false answers regarding the targets of the investigation. The Government clearly was not seeking further prosecution of defendant; rather it sought information upon which to predicate indictments of other persons and entities involved in the distribution and sale of counterfeit recordings, and defendant was so advised prior to his first appearance. Jacobs Affidavit at 2, ¶ 6.

■ Finally, this district was a proper venue for a grand jury investigation into the dealings between defendant and Verner, inasmuch as Verner lived in this district and Sam Goody, Inc., the alleged ultimate recipient of defendant's counterfeit products, is headquartered in this district. The relevant grand jury minutes and the prosecutor's affidavit make it abundantly clear that the grand jury was properly investigating criminal activity within this district.

Accordingly, defendant's motion to dismiss count 1 of the indictment on the

ground that the questions asked and answers given were not material to the investigation is hereby denied.

SO ORDERED.