UNITED STATES of America

v.

Lawrence LANDAU, Defendant.

No. 89 Cr. 0799 (KTD).

United States District Court,
S.D. New York.

Feb. 28, 1990.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Carol L. Sipperly, Asst. U.S. Atty., of counsel), for the U.S.

Lankler Siffert & Wohl, New York City (Roderick C. Lankler, Susan L. Sommer, of counsel), for defendant.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

On October 23, 1984, defendant Lawrence Landau testified before a federal grand jury investigating extortion by the International Brotherhood of Electrical Workers, Local 3 ("Local 3"). On October 19, 1989, Landau was indicted for perjury in violation of 18 U.S.C. § 1623(a) for allegedly having made a false material declaration before that grand jury.[1] In essence, Landau is accused of having falsely denied saying to a client in the winter of 1983 that he had made a payoff to Local 3.

Landau moves for an order dismissing the one-count indictment against him on the grounds that (1) he gave indisputably true answers before the grand jury to the prosecutor's fundamentally ambiguous questions, (2) his testimony was immaterial to the grand jury's investigation, (3) this indictment is the product of a perjury trap,

---

1. Section 1623(a) provides: "Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false declaration or makes or uses any other information ... knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

and (4) the four-year and 362–day delay between Landau's grand jury testimony and his indictment violated his right to due process under the fifth amendment.

## FACTS

The uncontested facts, except where otherwise noted, are as follows.

Landau is vice-president of Tade Construction Corporation ("Tade"), a general contractor specializing in small commercial and residential renovations. According to a Federal Bureau of Investigation ("FBI") 302 Report, an FBI agent interviewed Landau on February 8, 1984 regarding why Tade incurred cost overruns in 1983 on a $191,000 contract for renovations to office space for Image Communications ("Image"). Affidavit of Roderick C. Lankler, Exh. E.[2] The agent also asked whether modifications on the price Tade charged Image were in part due to union payoffs. Landau told the agent that the cost overruns were caused by additional, unbudgeted requests by Image's architect. He explained that although an electrical union had picketed the job site for several weeks, and Tade and Image's president, Richard Nava, had "had misunderstandings that were compounded by union squabbling," the cost overruns were "not the result of labor payoff negotiations." Landau also told the agent that Tade had not given any money to union officials. Exh. E at 2.

On October 23, 1984, Landau appeared before a federal grand jury investigating extortion by Local 3. Assistant United States Attorney ("AUSA") Walter Mack, Jr., questioned Landau about the events surrounding Tade's preparation of a series of documents in February 1983 that sought additional payments from Image to cover cost overruns. AUSA Mack also questioned Landau about a Modification Agreement between Tade and Image dated March 3, 1983 that increased payments to Tade by $20,000. Exh. B at 26–41, Exh. C, Exs. at 4–8.

**2.** All "exhibit" references are to exhibits annexed to the affidavit of Roderick C. Lankler,

At the time of Landau's grand jury testimony, the Government had in its possession a tape of a negotiation session between Landau and Nava on June 27, 1983. That conversation was taped without Landau's knowledge, apparently by Nava, who subsequently sued Tade on the Image job in state court for breach of contract. Exh. J. The transcript of the tape provided to the court sets forth, in relevant part:

NAVA: Get the twelve thousand dollars back from, uh, the Union.

LANDAU: Do I look like Houdini? If I look like Houdini I wouldn't be here, ... C'mon Rich ... I'm not ...

NAVA: I mean who ... Why, why were they paid that money?

LANDAU: They had to be paid.

NAVA: Why did they have to be paid?

NAVA: I mean, suppose you said, look I, ... I'm not paying it?

LANDAU: Because look at the damage they did the ... Let's start with the electrician ... They could've done more damage ... They were here for three weeks ...

They were here picketing for three weeks ... [inaudible] ... That they were here minimum of three weeks ...

And the electrician ... Who's good enough to work, OK? On a different shift ... without charging ...

LANDAU: Ah, I can't get that money back.

Why did I pay it? Paid it because I thought it was the best thing to do. I really didn't have a choice.

Exh. D at 3–4.

During his grand jury testimony, Landau denies ever having said to Nava that he had had to make a union payoff. AUSA Mack avers that he "did not specifically ask Mr. Landau questions regarding the conversation between Mr. Landau and Mr. Nava that occurred on June 27, 1983." Mack Affid. ¶ 8. AUSA Mack did not propose an indictment to the grand jury. Mack Affid. ¶¶ 1, 10.

except as noted otherwise.

After his October 23, 1984 grand jury appearance, Landau was not contacted by the Government about the matter until October 9, 1986, when he was visited by an FBI agent and a detective. Exh. F. According to their 302 Report, they played Landau a tape recording of the negotiation session between Landau and Nava on June 27, 1983. The agent and the detective told Landau that the tape contradicted portions of his grand jury testimony in 1984, and advised him "that his cooperation was being sought in information regarding Local 3 . . . relative to violations of Federal Labor Law." Exh. F at 3.

In 1986, AUSA Pittman was reassigned the investigation into union corruption. On December 2, 1986, AUSA Pittman met with Special Agent Jean Wynn, Landau, and Landau's then attorney, Edwin Levy, to discuss Landau's grand jury testimony two years before. Sipperly Affid. ¶ 6 and Exh. B. AUSA Pittman took notes of the meeting and Special Agent Wynn prepared a memorandum summarizing the meeting. Sipperly Affid. Exh. B. According to AUSA Pittman's notes, Landau said that he did not recall having the taped conversation in June 1983 but did not dispute that it had occurred. He reaffirmed that he never made a payoff to a union. He also stated that he had understood the questions he was asked before the grand jury to relate to February and March 1983, not to the June 1983 negotiation. Sipperly Affid. Exh. B.

Special Agent's Wynn's memorandum of the December 1986 meeting also states that Landau denied any inconsistency between his grand jury testimony and the June 1983 negotiations. The memorandum adds "AUSA Pittman advised S.A. Wynn that he will be consulting with AUSA Walter Mack before proceeding with this case." Sipperly Affid. Exh. B. Although there is no account of such a consultation with AUSA Mack, AUSA Pittman also did not propose an indictment to the grand jury

relating to the activities of Local 3 or Tade and terminated the investigation in early 1987. Sipperly Affid. ¶ 6(f).[3]

Landau heard nothing more about the matter for nearly three years, until he was told in the fall of 1989 by a new prosecutor, AUSA Carol Sipperly, that the Government was indicting him for perjury. On October 19, 1989, nearly the last business day before the five-year statute of limitations period would have run on the perjury charge, Landau was indicted on one count of violating 18 U.S.C. § 1623. The indictment specifies as perjurious Landau's answer to five questions posed in his October 23, 1984 grand jury appearance.

The question and answer preceding the first question specified in the indictment have been reproduced, followed by the five specifications in the indictment of Landau's allegedly false testimony:[4]

QUESTION "So we can be clear, then, that the only reason that Tade Construction or you utilized in order to increase the price of the contract in March of 1983 was the increased scope of work and the increased architectural intensity, is that correct?"

ANSWER "That's correct."

QUESTION 1 "And therefore any allegation that you said you had to pay off a union or the union caused you problems that necessitated you raising the price, would be a fabrication and a lie, is that true?"

ANSWER 1 "A 100 percent fabrication."

QUESTION 2 "Just so that we don't take advantage of you, we went [sic] to make certain, that even if it wasn't true, even if there were no union difficulties, did you ever use that perhaps as a negotiating technique in order to justify increased amounts for Image Communications?"

ANSWER 2 "Did I? I never did."

QUESTION 3 "So as far as you can recall, to the best, very best of your

---

3. The notes and memoranda of the December 1986 meeting were not discovered by AUSA Sipperly until January 16, 1990, when she was preparing her opposition to this motion. Sipperly Affid. ¶ 7.

4. The testimony the indictment alleges to be false is underlined.

recollection, you never told Mr. Nava or any employee or any representative of Image Communications that you had to make payments to the union or that it was necessary because of the union's picketing that it cost you more money?"

ANSWER 3 <u>"No, I never did."</u>

(Exh. B at 34–35, lines 11–25, 2–10)

\*　　\*　　\*　　\*　　\*　　\*

QUESTION 4 "All right. And is it fair to state that you've never told anyone else that you had to pay the union?"

ANSWER 4 "<u>I have never said that I had to pay any union officials any sums of money.</u>"

(Exh. B at 40, lines 22–25)

\*　　\*　　\*　　\*　　\*　　\*

QUESTION 5 "—you've told us that you never made such a payment or transfer of property or indicated to anyone that you have done so with respect to Image Communications?"

ANSWER 5 "<u>I haven't done it.</u>"

(Exh. B at 41, lines 12–15)

\*　　\*　　\*　　\*　　\*　　\*

## DISCUSSION

### I. *Fundamental Ambiguity*

Landau first argues that the indictment should be dismissed because his answers specified in the indictment were in response to fundamentally ambiguous questions and were in any event indisputably true.

The "perjury statute is not to be loosely construed." *Bronston v. United States,* 409 U.S. 352, 360, 93 S.Ct. 595, 601, 34 L.Ed.2d 568 (1973).[5] As such, "[p]recise questioning is imperative as a predicate for the offense of perjury." *Id.* at 362, 93 S.Ct. at 602. Concomitantly, the Supreme Court places the "burden on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360, 93 S.Ct. at 601.

The Second Circuit has held that when a "line of questioning is so vague as to be 'fundamentally ambiguous,' the answers

associated with the questions posed may be insufficient as a matter of law to support the perjury conviction." *United States v. Lighte,* 782 F.2d 367, 375 (2d Cir.1986) (quoting *United States v. Wolfson,* 437 F.2d 862, 878 (2d Cir.1970)). A question is fundamentally ambiguous when it " 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.' " *Lighte,* 782 F.2d at 375 (quoting *United States v. Lattimore,* 127 F.Supp. 405, 410 (D.D.C.), *aff'd per curiam by an equally divided court,* 232 F.2d 334 (D.C.Cir.1955)).

The Second Circuit has also pointed out that the "phrase 'fundamentally ambiguous' has itself proven to be fundamentally ambiguous." *Id.* Absent fundamental ambiguity, " 'the question of what a defendant meant when he made his representation will normally be for the jury.' " *Id.* (quoting *United States v. Diogo,* 320 F.2d 898, 907 (2d Cir.1963)). The issue of literal truth of defendant's answers thus becomes a question of fact to be resolved by a properly instructed jury.

■ As a threshold matter, I find that the prosecutor's questions specified in the indictment before me are fundamentally ambiguous because the prosecutor, whatever his intent, did not extend the time frame of the questions to include the relevant time period. Specifically, the initial question set out above refers to the negotiations *preceding* the March 3, 1983 Modification Agreement, thus setting a time frame for the questions that followed. Read in context, the specified questions asked Landau about statements he made as a negotiating tactic "in order to increase the price of the contract in *March of 1983.*" From a review of Landau's entire grand jury testimony, it was thus reasonable for Landau to understand that all of the questions specified in the indictment related ex-

---

**5.** Although *Bronston* involved a perjury charge under 18 U.S.C. § 1621, it applies with equal force to 18 U.S.C. § 1623. *United States v.* *Lighte,* 782 F.2d 367, 372 (2d Cir.1986); *United States v. Tucker,* 495 F.Supp. 607, 616 n. 11 (E.D.N.Y.1980).

clusively to the period prior to the March 3, 1983 Modification Agreement.

Indeed, the Government concedes that it did not question Landau before the grand jury about his June 27, 1983 negotiation with Nava. Mack Affid. ¶ 8. The Government, however, relies on the June 27, 1983 tape recording to evidence Landau's alleged perjury, made months after the March 3, 1983 Modification Agreement. That Landau made statements to Nava on June 27, 1983 about union payments, however, is not evidence that Landau made such statements to Nava or anyone else at Image prior to March 3, 1983. Thus, the tape recording of the June 1983 conversation, upon which the Government apparently relies as its primary evidence of perjury, does not contradict Landau's grand jury testimony.

The Government also contends that even if the prosecutor's questions related solely to the period prior to March 3, 1983, Landau's testimony is false because before March 3, 1983, while meeting with Nava on February 28, 1983, Landau allegedly demanded an increase in the Image contract price because he had had to make a $20,000 payment to Local 3 to prevent picketing. Mack Affid. ¶ 2. At that meeting Landau also handed Nava two documents listing Tade's construction costs, later marked as grand jury exhibits 5 and 8, which the Government alleges demonstrates that Landau told Nava of a $20,000 payment at the February 28, 1983 meeting and "memorialized" the fictitious payoff as "PAY OUTS AND COMMISSIONS."

However, both exhibits list as "PAY OUTS AND COMMISSIONS" the amount of $12,000, not $20,000. And Nava himself claimed in the June 23, 1983 conversation that the alleged payment was in the amount of $12,000, not $20,000. Lankler Affid. Exh. D. at 3. Furthermore, that the documents list a $12,000 figure for pay outs and commissions does not establish that Landau told Nava that the money was used to payoff a union. Nor is it evidence that a payoff actually took place. Landau was specifically questioned at length else-

where in his grand jury testimony about the $12,000 itemized in exhibits 5 and 8, and his responses to those questions are not claimed by the Government to be perjurious. Specifically, Landau testified that the $12,000 consisted of a commission to the Tade salesman who brought the Image job to Tade, a payment to Image's architect, insurance and telephone payments, and outlays for miscellaneous hardware. Lankler Affid., Exh. B. at 45–50, 52–54.

In addition to the prosecutor's failure to expressly frame his questions to apply to post-March, 1983, a review of the questions specified in the indictment reveal that they are poorly phrased and susceptible of different interpretations. For example, Question 1 above (Exh. B at 34, lines 17–21), appears to ask two questions: whether any allegation by Landau that he had to pay off a union was a fabrication and whether any allegation that the union caused "problems that necessitated ... raising the price" was a fabrication. As the question seems to refer to the period prior to the March 1983 Modification Agreement, Landau's negative response could well be literally true. The Government has taken no action on the basis that Landau actually paid off the union and produced no evidence relating to that issue aside from the June 27, 1983 tape.

And what was meant by the phrase "the union caused you problems that necessitated you raising the price" is not at all clear and could well give rise to multiple interpretations. The Government claims that, three questions prior to this question, the AUSA put this phrase into a clearer context. The AUSA asked Landau whether he had indicated to "Nava or some representative of Image Communications that the reason the contract price had to be increased was because of union difficulties or the need to payoff a union." Tr. 33, lines 17–22. I do not see how that question eliminates the ambiguity of Question 1. Indeed, the Government itself has stated three possible interpretations for Question 1.[6] Moreover, the Government's sugges-

---

**6.** The Government first states that "it is clear the question was referring to the contract price be-

tion that the subsequent defining of "union difficulties" to include picketing by later questions somehow clears up the ambiguity here is inexplicable. I therefore find that Question 1 is not one that could be used with mutual understanding by a questioner and answerer, and therefore is fundamentally ambiguous.

Question 2 (Exh. B at 34–35, lines 22–25, 2–3) is also fatally unclear. The Government contends that because Landau allegedly made statements regarding a pay-off on two occasions, in February 1983 and June 1983, the broader question of whether he "ever" made a statement regarding a union payoff gave him the opportunity to focus on the period subsequent to March 1983. However, considering the question in context and the Government's own admission that Landau was not questioned about the June 1983 conversation, it is unsurprising, and certainly not unreasonable, for Landau to have answered the question with reference only to the time period prior to March 1983. In similar circumstances, a motion of acquittal on a § 1623 conviction was granted where the defendant, in response to repeated questions whether he "ever" carried certain items into an apartment, responded in the negative. *United States v. Razzaia*, 370 F.Supp. 577 (D.Conn.1973). The prosecutor, however, had an FBI report that stated that on a specific day the defendant did carry those items into the apartment. Noting that "the questioner could have focused the witness's attention on [the] particular day" in question, the court found that "the ambiguities might well have been avoided." *Id.* at 579.

Moreover, the phrase "even if it wasn't true" in Question 2 has no point of reference. There was no question that Local 3 had in fact picketed the Image job, and thus the question apparently poses a hypothetical—even if there were no union "difficulties" did Landau ever make a statement regarding a union payoff in negotiating a

tween Image and Tade being increased to account for a union pay-off that was made to prevent union difficulties, such as picketing." Government Memorandum at 6. Next, the Government contends that the prosecutor

higher price with Nava—to which a perjurious answer could not be given. And again, the ambiguity here is not dispelled by the Government's contention that the term "union difficulties" is refined in the *following* question to include union picketing.

Similarly, Questions 3 through 5 fall victim to the same awkward phrasing and lack of clarity. Question 3 (Exh. B at 35, lines 4–10) is not artfully phrased. As Landau points out, the use of "it" twice in the final portion of the question with no clear antecedent is confusing. The Government, however, argues that in context it is clear that the prosecutor was asking whether payments to the union were necessary and whether the picketing cost more money. But not only is that a compound question that elicited a singular response, it also does not specifically ask Landau to respond with respect to post-March, 1983.

Question 4 (Exh. B at 40, lines 22–25) appears on page 40 of the grand jury transcript, five pages after Question 3 specified in the indictment. The questions and answers preceding it make no reference to statements by Landau to third parties concerning union payments. *See* Exh. B, p. 35, line 11 through p. 40, line 21. It is thus unclear who "anyone else" excludes from reference. And, again, Landau could reasonably have assumed that the question referred to pre-March, 1983.

Question 5 (Exh. B at 41, lines 12–15) is also unclear. To what does "such a payment or transfer of property" refer, especially when considered in the context of the immediately preceding exchange:

Question: "You haven't paid anyone, because you can assume—we have been talking today pretty much exclusively about Image Communications and that job. You can assume that if you have had to make any payment of any kind, and a payment from our point of view is a free trip to the Bahamas—"

"clearly ... was asking whether an allegation of a union pay-off was a fabrication or whether an allegation that union problems necessitated raising the contract price was a fabrication." *Id.*

Answer: "A T.V. set."

(Exh. B at 41, lines 6–11)

As Landau points out, he could reasonably assume after this exchange that he was being asked whether he had given anyone a free trip to the Bahamas or a T.V. set. Moreover, the question asked Landau what "you've told us" or to confirm that Landau had testified to the prosecutor's paraphrase. He thus answered as to how he had testified earlier in the proceeding. In *Lighte*, the Second Circuit held that when "a witness testifies that 'A' is a fact, and then is asked if has testified that 'A' is a fact, and he says yes, such response is truthful, regardless whether 'A' is a fact." 782 F.2d at 374. Landau's use of the term "it" also indicates that he was responding to the only one part of this two-part question, that is, whether he did make a payment to the union or whether he had said he made a payment to the union.

■ A basis for perjury is established when statements, in the context in which they were made, were materially untrue, "even if the statements could be literally true in isolation." *United States v. Schafrick*, 871 F.2d 300, 304 (2nd Cir.1989). When ambiguity in questioning is raised, the defense " 'may not be established by isolating a statement from its context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole.' " *Id.* at 304 (citing *United States v. Banacorsa*, 528 F.2d 1218, 1221 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976)). The testimony must be kept in context. *Lighte*, 782 F.2d at 373. Moreover, a perjury conviction is not precluded by the fact that some ambiguous questions were asked, for "[i]f the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations." *Id.* at 375.

Here it cannot be said that to "a person predisposed to answer truthfully, the ques-

tions were clear." *United States v. Albergo*, 539 F.2d 860, 864 (2d Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976). Read in context, it is the prosecutor's questions themselves, not merely Landau's answers, that give rise to multiple interpretations. As such, the Government must be held to its burden "to pin the witness down to the specific object" of the inquiry. *Bronston*, 409 U.S. at 360, 93 S.Ct. at 601. The prosecutor was free to question Landau specifically about the taped meeting in June 1983, the tape of which the Government concededly had in its possession in October 1984, but failed to do so. The AUSA's only specific question about negotiations between Tade and Image after the March 3, 1983 Modification Agreement was: "Suffice it to state that you have had some further contract disputes with Mr. Nova [sic] subsequent to the modification agreement, is that a fair statement," to which Landau assented. Exh. B, at 36.

The Second Circuit's recent decision in *Lighte* is also instructive. There the court held that two of the questions asked of the defendant were fundamentally ambiguous because of the imprecise use of the pronoun "you" and thus should not have been submitted to the jury. 782 F.2d at 375. The court found that throughout the questioning the examiner failed to differentiate between the defendant's actions as trustee and those which he undertook in an individual capacity. Each question was addressed to the defendant as "you," and he could well have answered each as if directed to him in his individual capacity. Like the questions in *Lighte,* the questions here also rise to the level of fundamental ambiguity.

In sum, in the context of all the preceding questions and Landau's grand jury testimony as a whole, the prosecutor's questions here are fundamentally ambiguous and cannot as a matter of law to support a perjury conviction.[7] Landau's motion is

---

**7.** Landau's further arguments—that his testimony was not "material" to the grand jury investigation, that he was the victim of a "perjury trap", and that the pre-indictment delay violated his due process rights—thus need not be considered.

therefore granted and the indictment is dismissed.

SO ORDERED.