**UNITED STATES of America**

v.

**Ronald CAREY, Defendant.**

**No. 01 CR. 72(RLC).**

United States District Court,
S.D. New York.

July 11, 2001.

Mary Jo White, United States Attorney for the Southern District of New York, Attorney for the United States of America, New York City, Andrew S. Dember, Deborah A. Landis, Assistant United States Attorneys, of Counsel.

Steptoe & Johnson LLP, Attorneys for Defendant, Washington, DC, Reid H. Weingarten, Mark J. Hulkower, of Counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Defendant Ronald Carey was charged in Indictment 01 Cr. 72 ("the Indictment") with five counts of making false statements in matters within the jurisdiction of the government (18 U.S.C. § 1001), and two counts of perjury before a grand jury (18 U.S.C. § 1623). He now moves to: (1) dismiss Counts One, Five, Six and Seven for improper venue; (2) transfer the case for trial to the United States District Court for the District of Columbia; (3) dismiss Counts One, Three, Four, Five, Six and Seven for failure to state an offense; (4) dismiss Counts One, Two, Five, Six and Seven for failure to state an offense; (5) strike certain language alleged to constitute surplusage from the Indictment; (6) preclude the government from introducing certain evidence concerning the ultimate disposition of two investigations into Carey's conduct; and (7) require the government to provide Carey with a bill of particulars.

## BACKGROUND

In 1988, the government filed an action under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against, *inter alia,* the International Brotherhood of Teamsters ("IBT"), its General Executive Board ("GEB") and members of the GEB. (Ind. ¶ 11.) The government alleged, among other things, that the leaders of the IBT were operating the union in an undemocratic way and that the leadership had been corrupted by organized crime. *Id.* On March 14, 1989, Judge Edelstein, United States District Judge of this court, signed an order settling the government's claims against the IBT defendants (the "Consent Decree").[1] *Id.*

---

1. A copy of the Consent Decree is attached to the Bishop Affidavit as Exhibit 5.

The Consent Decree established an Independent Review Board ("IRB") to investigate allegations of corruption and influence from organized crime. (Ind.¶ 12.) It required secret ballot elections by the IBT membership. *Id.* To ensure the proper functioning of the democratic process, the Consent Decree also provided that the court would appoint an Election Officer to oversee the 1991 IBT election of officers, and, upon request by the government, the 1996 IBT election. *Id.*

The government exercised its right to have the 1996 election supervised and, pursuant to the government's request, Judge Edelstein signed an order in 1995 that governed the supervision of the 1996 IBT election. (Ind.¶¶ 12,13.) Among other things, this order provided that an Election Officer and Election Appeals Master would be appointed by the court, and that they would report periodically to the court on the progress of the election. (Ind.¶ 13.) The court retained exclusive jurisdiction to supervise the activities of the Election Officer and the Election Appeals Master. *Id.* Pursuant to this authority, the court approved the "Rules for the 1995–1996 IBT International Union Delegate and Officer Election" (the "Rules"), which would govern the election. *Id.* The court appointed Barbara Zack Quindel to act as Election Officer for the 1996 IBT elections. (Ind.¶ 14.)

Carey, who had been elected General President of the IBT in the 1991 election, ran for reelection in 1996 against James P. Hoffa. (Ind.¶ 16.) After Quindel finished counting the ballots, she determined that 237,028 IBT members voted for Carey and 221,110 members voted for Hoffa. (Ind. ¶ 17.)

Following the election and a review of campaign contribution and expenditure reports, Quindel initiated an investigation into possible Rules violations. (Ind.¶ 29.)

On July 17, 1997, representatives of Quindel interviewed Carey under oath at a deposition. *Id.* On August 21, 1997, Quindel ordered a rerun of the 1996 IBT election after determining that misuse of IBT funds benefitted the Carey campaign. *Id.* Shortly thereafter, Quindel discovered information that led her to recuse herself. *See United States v. IBT*, 247 F.3d 370, 376 (2d Cir.2001). On September 29, 1997, Judge Edelstein designated former federal District Judge Kenneth Conboy as Election Officer "for the sole purpose of investigating and deciding the issue of disqualification of Ronald Carey from the rerun election." *Id.* In this capacity, Conboy questioned Carey under oath in a deposition on November 10, 1997, regarding his knowledge of improper campaign contributions. (Ind.¶ 29.)

In March, 1997, the United States Attorney for the Southern District of New York initiated a grand jury investigation into, among other things, whether IBT funds had been used to finance the Carey campaign. (Ind.¶ 29.) Carey testified under oath before the grand jury on July 16, 1997, October 1, 1997, and November 21, 1997. (Ind.¶ 29.) Carey also testified, under oath, on October 28, 1997, before the IRB's Chief Investigator regarding his participation in, and/or knowledge of, a scheme to misappropriate IBT funds in an effort to aid his campaign. *Id.* In connection with the IRB's investigation, Carey again testified at an IRB hearing on January 21 and 22, 1998. *Id.*

The government's position appears to be that Carey had knowledge of, and/or participated in, an unlawful scheme to fund his IBT presidential campaign whereby he would authorize contributions of IBT funds to various political groups and other organizations in exchange for donations to his IBT campaign from those groups or interested wealthy individuals.

## DISCUSSION

*(1) Defendant's Motion to Dismiss Counts One, Five, Six and Seven for Improper Venue*

Carey moves to dismiss Counts One, Five, Six and Seven for improper venue pursuant to Rule 12(b), F.R.Crim. P. These counts allege the making of material false statements in violation of 18 U.S.C. § 1001 ("§ 1001"). Carey asserts that venue is proper only in the District of Columbia because the statements took place there. The government contends that the statements were received in the Southern District of New York ("this district") in connection with Judge Edelstein's administration of the Consent Decree, and therefore venue is proper in this district.

■ Where, as here, the government "has provided the court with a 'full proffer' of the facts it intends to introduce at trial to establish venue, the Court may decide whether venue is proper before trial." *United States v. Mittal*, 1999 WL 461293, at *4 (S.D.N.Y. July 7, 1999) (Koeltl, J.). Since the defendant is charged in more than one count, venue must be proper with respect to each count. *See United States v. Beech–Nut Nutrit. Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989). Pursuant to the Sixth Amendment, venue is proper in the "district wherein the crime shall have been committed."[2] However, venue for a continuing offense, that is, an offense begun in one district and completed in another, or committed in more than one district, may be prosecuted in any district in which such offense was "begun, continued, or completed." 18 U.S.C. § 3237(a).

■ Courts have held that a false statement under § 1001 may constitute a continuing offense where there exists a "geographic discontinuity between the defendant's physical *making* of the statement, whether oral or written, and the *actual* receipt of that statement by the relevant federal authority." *United States v. Bin Laden*, 146 F.Supp.2d 373, 376 (S.D.N.Y. 2001) (Sand, J.). Accordingly, charges under § 1001 may be prosecuted in the district in which the false statement was prepared, mailed or uttered, and in any district into which the statement was "propelled" by the defendant and received or acted upon by the government. *Cf. United States v. Candella*, 487 F.2d 1223, 1228 (2d Cir.1973).

■ Here, the allegedly false statements were made in the District of Columbia to an election officer (Count One), the Chief Investigator to the IRB (Count Five), and the IRB itself (Counts Six and Seven). These officials were appointed pursuant to the Consent Decree to supervise and investigate IBT activity and were charged by the Consent Decree and subsequent court rulings[3] to file reports and submit decisions to the court for its approval.[4] IBT officers, members and em-

---

**2.** Rule 18, F.R.Crim. P., provides that "the prosecution shall be had in the district in which the offense was committed."

**3.** *See, e.g., United States v. IBT*, 829 F.Supp. 602, 607–08 (S.D.N.Y.1993) (Edelstein, J.) (requiring IRB to submit all decisions to the court for approval and to submit quarterly reports).

**4.** Carey contends that because the allegedly false statements were made to independent, private union officials rather than federal offi-

cials, the statements were complete when received in the District of Columbia. *See, e.g., United States v. IBT*, 156 F.3d 354, 359–60 (2d Cir.1998) ("[T]his Court has previously held that officials appointed pursuant to the IBT Consent Decree are not state actors."). Under § 1001, it makes no difference whether Carey's statements were propelled into the jurisdiction of the federal government, and therefore into this district, by a private, state or federal actor. *See United States v. Davis*, 8 F.3d 923, 929 (2d Cir.1993) (finding false

ployees were obligated to "cooperate fully" with the Election Officer and IRB, and were warned that failure to cooperate placed them in reach of disciplinary action and criminal sanctions. *See, e.g.,* Consent Decree at 20; *United States v. IBT,* 45 F.Supp.2d 309, 312 (S.D.N.Y.1999) (Edelstein, J.) ("IBT members . . . who provide false statements to the Election Officer face possible criminal sanctions [under] 18 U.S.C. § 1001."). At all times, Judge Edelstein retained exclusive jurisdiction to implement the Consent Decree. Carey therefore knew, or reasonably should have known, that his false statements would be "propelled" to and acted upon in this district.[5] *See United States v. Kim,* 246 F.3d 186, 193 (2d Cir.2001) (finding venue proper in district where it was foreseeable that fraudulent invoices would be acted upon).[6]

■ The Second Circuit has noted that even if venue appears proper under a continuing offense theory, a court should also "ask whether the criminal acts in question bear 'substantial contacts' with any given venue." *United States v. Saavedra,* 223 F.3d 85, 93 (2d Cir.2000) (citing *United States v. Reed,* 773 F.2d 477, 481 (2d Cir. 1985)). The "substantial contacts" test set forth in *Reed* articulates four factors that courts should consider in determining venue: (1) the site of defendant's acts; (2) the elements and nature of the crime; (3) the locus of the effect of the criminal conduct; and (4) the suitability of the district for accurate factfinding. *See Reed,* 773 F.2d at 481.[7]

In this case, although factor one points to venue in the District of Columbia, the remaining factors indicate that venue is proper in this district as well. One of the essential elements of § 1001 is that a false statement be made, not in private, but in a "matter within the jurisdiction of . . . the Government of the United States." In order for the government to prove the jurisdictional element in this case, it must prove that the false statements arose under the Consent Decree issued by Judge Edelstein in this district.

As to the effects of the crime, the court notes that under the limited facts of this case, the false statements, like the perjury in *Reed,* appear "fully analogous to contumacious conduct." *Reed,* 773 F.2d at 484. Carey's allegedly false statements were made to officials appointed pursuant to the Consent Decree, for the sole purpose of ridding the IBT of corruption. As such, his statements had the effect of obstructing the court's continued efforts to ensure the integrity of its rulings. "As in the case of criminal contempt, a court unable to punish false testimony affecting its proceedings would be at the mercy of the

---

statements made to state agency, where matter within jurisdiction of federal agency, a violation of § 1001); *United States v. Gibson,* 881 F.2d 318, 322–23 (6th Cir.1989) (finding that false invoices submitted to private company violated § 1001 because company contracted with and reported to federal agency).

5. The court notes that this case is so intertwined with the Consent Decree, that had Judge Edelstein been alive, it likely would have been heard by him, without its movement through the "wheel."

6. This case is distinguishable from *Bin Laden,* 146 F.Supp.2d at 376, where venue in this district was found wanting because defendant's false statements to the FBI were uttered and received wholly inside Texas. Unlike the FBI, which is an independent investigative agency, the officials that questioned Carey were appointed pursuant to the Consent Decree emanating from this district.

7. Applying those factors, the *Reed* court found that perjury committed in an ancillary proceeding (a deposition in a different district), could be prosecuted in the district in which the parent proceeding was pending. *See id.* at 484.

limited resources and prosecutorial priorities of a foreign district." *Id.*, 773 F.2d at 484.[8]

Lastly, this district is suitable for factfinding, since it produced the underlying Consent Decree, it has been the site of continued law enforcement efforts to rid the IBT of corruption, and many of the witnesses are located here. *Cf. Saavedra*, 223 F.3d at 93 (finding district suitable for factfinding where it "has been the site of concerted law enforcement efforts to disable the Latin Kings' racketeering activities," even though action in question occurred elsewhere).

Under the facts as described in the government's proffer, venue in this district is proper. Accordingly, the motion to dismiss Counts One, Five, Six, and Seven is denied.

*(2) Defendant's Motion for Transfer*

Carey next contends that the court should transfer this case to the District of Columbia pursuant to Rule 21(b), F.R.Crim. P. Generally, "a criminal prosecution should be retained in the original district," unless the interests of justice require a transfer. *United States v. Guastella*, 90 F.Supp.2d 335, 338 (S.D.N.Y.2000) (Kram, J.). The defendant bears the burden of establishing the need for transfer. *See id.*

■ In ruling on a Rule 21(b) motion, a court should consider a variety of factors, including: (a) location of the defendant; (b) location of possible witnesses; (c) location of events at issue; (d) location of relevant documents and records; (e) potential disruption of defendant's business;

(f) expense to the parties; (g) location of defense counsel; (h) relative accessibility of the place of trial; (i) docket conditions of each potential district; and (j) any other special circumstance that might bear on the desirability of transfer ("*Platt* factors"). *See Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243–44, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). No one of these considerations is dispositive, and "[i]t remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990). The decision to grant a Rule 21(b) motion rests with the discretion of the trial court. *See id.*

■ The crux of Carey's argument rests on the fact that four of the seven counts of the Indictment concern allegedly false statements made in Washington, D.C., and that the underlying conduct that was the subject of these statements—unlawful enrichment of the Carey campaign—occurred chiefly in Washington, D.C. Carey contends that the location of these events favors venue in the District of Columbia.

Carey's argument glosses over the fact that this case originates with the Consent Decree executed by the United States Attorney's Office for this district and the IBT, and approved by Judge Edelstein, District Judge for this district. As discussed above, the Consent Decree provided Judge Edelstein with extensive supervisory powers, including oversight of IBT elections. Pursuant to this authority, Judge Edelstein appointed the Election Officers and retained exclusive jurisdiction

---

**8.** *Bin Laden* recently shed doubt on whether the effect factor should apply to § 1001 violations at all, since § 1001 is not defined in terms of effect. *See id.*, at 377–79 (noting no requirement under § 1001 to prove that the false statement had any misleading effect). We need not reach that issue here, since *Reed* does not require that all the factors point to venue in the same location, and two or more of the factors are generally sufficient. *See id.* In any event, if the effect factor does not apply to § 1001 violations, it can point neither to venue in this district, nor the District of Columbia.

to supervise the activities of the IRB. Carey is charged with making false statements to these officials concerning the 1996 IBT election. Therefore, although some of the statements may have occurred elsewhere, the heart of the events at issue lies with the Consent Decree in this district.

Furthermore, three of the counts of the Indictment involve false statements and perjury allegedly perpetrated in this district, and the fund-raising improprieties that were the subject of Carey's statements were accomplished through deposits into a bank account in this district. The Carey campaign lawyers, who orchestrated the fund-raising, were located in and made relevant phone calls from this district. Therefore, as to "the events which will be in question," the genuine "center of gravity" appears to be in this district. *United States v. Clark*, 360 F.Supp. 936, 941 (S.D.N.Y.1973) (Griesa, J.).

Carey next asserts that the "overwhelming majority of witnesses in this case live and/or work in the Washington, D.C. metropolitan area." (Carey Motion at 3.) Carey lists fifteen potential witnesses who reside in the Washington, D.C. area, two who live or work in the New York area, and four who reside elsewhere.[9] The government asserts that three of its witnesses reside in the Washington, D.C. area, three in the New York area, and three reside elsewhere. Since the number of Washington, D.C. witnesses outnumbers the New York witnesses, this factor appears to favor transfer. However, the strength of this factor is mitigated by the tendency to inflate witness lists, and the fact that New York and Washington, D.C. are within a three-hour train ride or a one-hour plane ride from each other. *See United States v. Hamilton*, 1999 WL 349697, at *1

(S.D.N.Y. May 27, 1999) (Griesa, J.) ("experience has taught that on a motion for transfer, the parties often come forward with an extensive list of witnesses that favor their desired venues.").

As to the location of Carey's counsel, the court notes that Carey's Washington, D.C. counsel has represented him at all stages of this investigation, since it began in 1997. Carey explains that it was logical to retain Washington, D.C. counsel in the early stages of the investigation since the Election Officer and the IRB, both of which were conducting simultaneous investigations, were located in Washington, D.C., and Carey then lived and worked in Washington, D.C. The government counters that Carey was aware as early as 1997, when he first testified before the grand jury in this district, that the United States Attorney's Office for this district was conducting a criminal investigation into his reelection campaign. Moreover, Carey was indicted in this district in January of this year and has had over six months to involve local counsel. Therefore, even if this factor favors venue in Washington, D.C., its force is slight; it does not outweigh the numerous other factors favoring venue in this district.

The expense of bringing trial witnesses and counsel to New York also does not vitiate venue in this district. Carey has indicated that if trial proceeds in this district he will be forced to pay the travel, lodging and meal costs of his Washington, D.C. counsel and witnesses at the height of the New York summer tourist season. However, if venue is transferred to the District of Columbia, the effect is merely to shift the economic burden to the government which would be required to relocate its witnesses, two United

---

**9.** Carey submitted a list of witnesses and financial information *ex parte,* and the government objected. The court allowed the sub-

mission, recognizing Carey's concern that revelation of this information at an early stage might compromise his defense.

States Attorneys, three FBI agents and one paralegal during the height of the Washington, D.C. summer tourist season. While the government may be in a better position to bear this expense than a private party, Carey has not demonstrated that the expected expense will infringe on his ability to defend himself. *See, e.g., United States v. Aronoff,* 463 F.Supp. 454, 459 (S.D.N.Y.1978) (Cannella, J.) (finding transfer appropriate where the defendant could not afford to travel to and live in New York during trial). Thus, the Court finds that this factor "is a neutral factor that weighs in favor of neither side." *Guastella,* 90 F.Supp.2d at 340–41 (finding expense factor neutral where transfer would merely shift expense to government and co-defendants).

An additional circumstance that bears on the desirability of transfer is the timing of Carey's motion. A motion to transfer venue may be made at or before arraignment and at any time thereafter. *See* F.R.Crim. P. 22. Carey was arraigned on February 1, 2001, but did not file this motion, or advise the court of his intent to do so, until May 17, 2001, three months before the scheduled trial date. Carey contends that "the parties agreed to pursue discovery first, and to submit pretrial motions following the completion of discovery." (Carey Reply Mem. at 16.) However, the court and government agreed to this schedule before they were made aware of Carey's intent to file a motion to transfer. Since no discovery was necessary to discern the venue issue, and in fact, all the information necessary to raise his venue concerns was present on the face of the indictment, Carey should have informed the court of his intent to file this motion earlier. Granting the motion to

transfer at this late stage would cause unnecessary delay and inconvenience. *See United States v. Kewylian,* 602 F.2d 1033, 1038–39 (2d Cir.1979) (upholding denial of 21(b) motion where most important factor in the district judge's decision was defendant's delay in moving to transfer the case).

The remaining *Platt* factors also support venue in this district. Carey concedes that he resides in Queens, New York, and that he is currently unemployed, such that trial in this district will not be disruptive or inconvenient. Carey also concedes that relevant documents and records are in the possession of the United States Attorney's Office in this district, and that the docket conditions of both districts are similar.

Accordingly, Carey has not met his burden to prove a need for transfer. The motion to transfer venue is therefore denied.

*(3) Defendant's Motion to Dismiss Counts One, Three, Four, Five, Six and Seven for Failure to State an Offense*

Carey next moves to dismiss Counts One, Three, Four, Five, Six and Seven for failure to state an offense under 18 U.S.C. §§ 1001 and 1623, arguing that those counts contain numerous statements that are (1) literally true or (2) responsive to fundamentally ambiguous questions.[10]

*Carey's "Literal Truth" Defense*

The United States Supreme Court made clear in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), that an individual cannot be convicted of perjury for an answer given under oath that is literally true, even if it is unresponsive and intended to mis-

---

**10.** Carey moves to dismiss these counts, but he does not argue that certain specifications in each of these counts could not form the basis for a false statements or perjury prose-cution. Therefore, even assuming Carey's arguments are meritorious, the court would only strike certain specifications, and not the entire counts.

lead. The Court noted that "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360, 93 S.Ct. 595. (The "literal truth" defense also applies to false statement prosecutions under 18 U.S.C. § 1001. *See United States v. Mandanici*, 729 F.2d 914, 921 (2d Cir.1984).) Whether a statement was literally true is generally an issue for the jury to decide. *See United States v. Lighte*, 782 F.2d 367, 372, 374 (2d Cir.1986). Nevertheless, the court may make this determination in limited circumstances where "there can be no doubt that [the defendant's] answers were literally true under any conceivable interpretation of the questions." *Id.* at 374. The consideration of this defense, whether by the court or the jury, is not made in a vacuum; it must take into account the context of the testimony as a whole. *See United States v. Schafrick*, 871 F.2d 300, 303–04 (2d Cir.1989).

Turning to the facts of this case, Carey argues that many of his statements listed in Counts One, Three, Four and Seven were literally true in that they were responses to (1) hypothetical questions about what Carey "would have done" in particular situations, or (2) questions which merely asked Carey to confirm his earlier testimony.

*Hypothetical Questions*

 Carey contends that a "perjury or false statements prosecution cannot be based on responses to hypothetical questions . . . ." [11] (Def.'s Mem. of Law in Support of Pretrial Motion No. 3 at 4.) The government refutes this assertion, arguing

that if a defendant testifies regarding what he would do under certain circumstances, if those circumstances are proven to have occurred, and if the government proves that the defendant did not act in the way that he said he would, then the defendant may be convicted of perjury or making false statements. (Gov.'s Mem. of Law in Opp. to Def's Pretrial Motions at 71.) The court disagrees. Even assuming the government can prove the hypothetical situations actually existed, when the defendant describes what he "would have done" rather than what he actually did, the defendant is not bound by reality, but rather is free to describe a course of action which would have been appropriate under the circumstances.

In light of *Bronston*'s holding that the questioner bears responsibility for evasive, though truthful, responses, 409 U.S. at 358–59, 93 S.Ct. 595, the court will not countenance these types of awkward questions or answers. Here, the various examiners asked Carey directly whether he remembered certain contributions, or knew about any connection between IBT contributions and Carey fund-raising. These are the types of questions which elicit testimony that may properly form the basis of a false statements prosecution. The extra, hypothetical responses cannot possibly be proven false. As a result, the court will strike: Specification (d) in Count One; Specifications (d), (1), (p), (q) and (s) in Count Three; and Specification (i) in Count Four.[12] (Specification (s) in Count Three and Specification (i) in Count Four belong to chains of testimony which con-

---

11. There is some support in the case law for Carey's position. *See, e.g., United States v. Landau*, 737 F.Supp. 778, 783 (S.D.N.Y.1990) (Duffy, J.).

12. Carey also moves to strike his response in Specification (e) in Count Three, "I don't think that I have ever rejected any contribu-

tions for any organization if it was an organization that in my view was effective and made sense to do so." He contends that this is a hypothetical answer. In fact, this answer is not hypothetical, but rather sets forth the criteria he used in allowing contributions. Therefore, it will not be stricken.

tain other allegedly perjurious answers. They may therefore remain in the Indictment for purposes of providing context, so long as the underlining which labels them as allegedly perjurious is removed.)

*Repetition of Earlier Testimony*

Carey also argues that certain responses, which are alleged to be perjurious in the Indictment, are literally true because they answer questions that merely asked him to repeat or confirm earlier testimony. The Second Circuit has noted, "[w]hen a witness testifies that 'A' is a fact, and then is asked if he has testified that 'A' is a fact, and he says yes, such a response is truthful, regardless of whether 'A' is a fact." *Lighte,* 782 F.2d at 374. As explained in greater detail below, repeating the substance of the earlier testimony, rather than merely confirming that an earlier statement was made, may also qualify as a literally true response. (*See* Discussion *infra* at 426–27.)

In making this argument, Carey has highlighted a number of answers that are not labeled as perjurious in the Indictment; rather, they are included for context.[13] Obviously, he is not entitled to have these provisions stricken under the theory that they are literally true when the government does not contend that they are unlawful.

His argument extends to other testimony that is labeled as perjurious in the Indictment. In particular, he asserts that Specifications (a), (j) and (k) in Count Four and Specifications (c) and (d) in Count Seven are literally true repetitions of previous testimony.

Carey has failed to demonstrate, however, whether he earlier testified to each of the issues about which he was subsequently being questioned. In *Lighte,* the Second Circuit had the benefit of an extended, continuous portion of the grand jury transcript which made clear that the defendant had in fact testified earlier to the fact which the questioner was later trying to confirm. 782 F.2d at 371 n. 1. It was evident, therefore, that the defendant's answer was literally true insofar as it was a repetition of earlier testimony.

In this case, Carey has not provided transcripts that demonstrate that he is merely repeating or confirming his earlier testimony. Indeed, with Specifications (a) and (j) of Count Four and Specification (d) of Count Seven, it is unclear from the Indictment that Carey earlier provided an unequivocal answer.[14] Certainly several of

---

13. Carey argues that the following answers are literally true. They are not, however, identified as perjurious in the Indictment.

Q: So you are saying that the mere mention of Jere Nash's name would have raised a red flag for you...?

A. That's correct.

\* \* \* \* \* \*

Q: Is it your testimony, then, that you do not recall the substance of any conversation that led you to authorize a total of close to three-quarters of a million dollars in Treasury funds for contributions between October 17th and October 31st?

A: That's correct.
(Indictment at 28–29 (Count Four).)

Q: I understand it is your testimony that Ms. Simpkins never told you that she had signed—approved a request for contribution in this area by putting your initials down on paper?

A: That is correct.
(Indictment at 38 (Count Seven).)

14. For example, Specification (j) from Count Four is:

Q: Now, just so I am completely clear on your testimony, Mr. Carey, are you certain that you have absolutely no recollection of why you approved that $475,000 contribution?

A: *I do not know how I can tell you in any other way, I do not recall this contribution.* (Indictment at 29 (Count Four).) Carey testified in an earlier proceeding about this issue

the questions seem to call for a mere repetition of testimony. This alone, however, does not mean that Carey's answers are literally true. First, Carey may be adding facts in his answer which go beyond that to which he testified before. *See United States v. Weissman,* No. S2 94 Cr. 760(CSH), 1996 WL 742844 *17 (S.D.N.Y. Dec. 20, 1996) (Haight, J.). Second, the questioners may be incorrectly paraphrasing Carey's earlier testimony.[15] The court, therefore, will not strike these specification before there is additional evidence in the record.

 There are two specifications, however, which should be stricken under the rationale that the answers merely restate previous testimony:

> Q: Is it your testimony that Jere Nash never told you with respect to any of these four contributions [to Citizen Action, Project Vote, the national Council of Senior Citizens, and the AFL–CIO] that it would somehow benefit your campaign if the contributions were authorized?
>
> A. *Absolutely not.*

(Indictment at 29 (Count Four).)

> Q: You have been asked about whether you recall the $225,000 request with regard to Citizen Action and I take it that your testimony is you do not recall that specific request?

> A: *I do not.*

(Indictment at 38 (Count Seven).)

In these specifications, it is manifest from earlier testimony that Carey had previously answered the questions. *See* Indictment at 26, 31–32. The inartful phrasing of the interrogation makes it impossible to rule out the possibility that Carey was being asked to confirm his earlier testimony. This holding comports with the decisions of the Second Circuit and this court. *See Lighte,* 782 F.2d at 371 n. 1, 374; *United States v. Landau,* 737 F.Supp. 778, 781, 784 (S.D.N.Y.1990) (Duffy, J.); *Weissman,* 1996 WL 742844, *17 (Haight, J.).

Relying upon a case from the Eastern District of New York, the government argues that the court should look to whether Carey "can be understood to respond to the question about the underlying facts, not whether he had previously given certain testimony." *United States v. DeSalvo,* 797 F.Supp. 159, 172 (E.D.N.Y.1992).[16] This is an attractive position, but one which was apparently rejected by the courts cited above. For example, in *Landau,* the defendant was asked: "You've told us that you never made such a payment or transfer of property or indicated to anyone that you have done so with respect to Image Communications?" 737 F.Supp. at 781. The defendant's response, "I haven't done it," suggested that he was giving an answer to the substance of the

---

and seems to have implied that he could not recall the contribution. *See* Indictment at 16. The matter is unclear, however.

**15.** For example, if a witness testifies to "X"— or to nothing at all—, the questioner asks whether he testified to "A", and the witness responds that he did testify to "A", then his testimony would be false.

**16.** The *DeSalvo* opinion is distinguishable from the present case. In *DeSalvo,* the witness' answer was more detailed than the an-

swers here, and based upon the context of the testimony, the witness could be understood to be "sharpening his recitation of [underlying facts]." 797 F.Supp. 159, 172–73. If the witness is clarifying an earlier answer with additional facts, his answer is not literally true under *Lighte* as a mere regurgitation of testimony. On the other hand, where a witness is simply repeating identical testimony to answer a question asking him about his testimony, it is impossible to prove his answer false.

question. *Id.* Nevertheless, the court ruled that the statement was a literally true repetition of earlier testimony. *Id.* at 784. Likewise, in *Lighte* and *Weissman* the courts found that responses which also could be interpreted to speak to the underlying facts of the questions were literally true. *Lighte,* 782 F.2d at 371 n. 1, 374 (finding that the following answer could not be perjurious as a matter of law: "Q: Am I to understand that you permitted Mr. Diaz to open an account with your name without asking why or what it's going to be used for? A: Yes, as a trust account, yes."); *Weissman,* 1996 WL 742844, *17 (noting that the following testimony was not perjurious: "Q: You said, I believe, that the internal report was utilized in preparing the annual statements, along with updated information that came in subsequent to that report, is that correct? A: As a general rule, between 1989 and 1992, that is correct."). The court is unable to discern any meaningful difference between the testimony offered in this case, and the testimony that the courts above found could not be perjurious as a matter of law. As a result, the court strikes Specification (k) from Count Four and Specification (c) from Count Seven.

*Carey's Defense of Fundamental Ambiguity*

■■■■■■■ Carey also argues that certain testimony should be stricken because the relevant questions and/or answers are fundamentally ambiguous.[17] "When a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support the

perjury conviction." *Lighte,* 782 F.2d at 375. "A question is fundamentally ambiguous when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Id.* (quoting *United States v. Lattimore,* 127 F.Supp. 405, 410 (D.D.C.), *aff'd,* 232 F.2d 334 (D.C.Cir.1955)). The concept of fundamental ambiguity derives from the early case of *United States v. Lattimore,* 127 F.Supp. 405, in which the court ruled that the defendant's answer as to whether he was a "follower of the Communist line" could not support a perjury conviction.

■■■■ It is important to note that this doctrine is of limited applicability. As the use of the adverb "fundamentally" makes clear, it is not enough for a question to be ambiguous because virtually any question may be deemed ambiguous if one employs an adequately sophisticated analysis. *See United States v. Chapin,* 515 F.2d 1274, 1279 (D.C.Cir.1975). Furthermore, a defendant may still be guilty of perjury or making false statements where his answer to an ambiguous question is false under any reasonable interpretation. *See United States v. Diogo,* 320 F.2d 898, 907 (2d Cir.1963).

The issue that the jury must resolve in a false statements prosecution is "whether the question—as the declarant must have understood it, giving it a reasonable reading—was falsely answered." *Lighte,* 782 F.2d at 372. In addition, as in the case of determining whether an answer is literally

---

**17.** Carey argues that both ambiguous questions and answers should be stricken from the record. The courts which have addressed this issue, however, have indicated that only fundamentally ambiguous questions may justify dismissal, and that ambiguous answers are a matter for the jury's consideration. *See*

*Lighte,* 782 F.2d at 375; *United States v. Bonacorsa,* 528 F.2d 1218, 1221 (2d Cir.1976). Because the court declines to strike any of the questions or answers at this time as fundamentally ambiguous, there is no need to address this issue in greater detail.

true, the court should consider the context of the testimony to determine whether a question is fundamentally ambiguous. *See id* at 373. Extrinsic evidence may also be relevant in determining how a particular witness interpreted a question. *See id.* Therefore, striking testimony at this early stage in the proceedings is rarely appropriate.

The court now turns to the specific exchanges identified by Carey as fundamentally ambiguous. He notes that several questions are compound and argues that they are, therefore, fundamentally ambiguous. (Def.'s Mem. in Support of Pretrial Motion No. 3 at 13–17.) The fact—in and of itself—that a question is compound does not require it be stricken. As mentioned before, if the government can demonstrate that his answer was false with regard to the various elements of the compound question, Carey could still be guilty of perjury or making false statements. For example, if the questioner asks whether the witness spoke to either "A" or "B" and the witness simply replies "Yes", the witness' answer would be false if in fact he spoke to neither "A" nor "B." Carey has not satisfied his burden on demonstrating that his answers to these compound questions cannot possibly be proven false.

Carey also argues that certain exchanges use the pronouns "this," "that," "they," or "these" which he contends are fundamentally ambiguous. When viewed in context, however, the meanings of these terms are more clear. For example, Carey complains that the word "this" in the final sentence of his answer in the following exchange is equivocal:

> Q. Okay. What contributions did you hear about that were returned?
>
> A. That there may have been a check with a business name on it or a

business, and that, of course, in my view is an employer. This all came out as a result of what we're discussing today. *I mean, at the time no one discussed this with me.*

(Indictment at 34 (Count Five).) The preceding testimony listed in the Indictment strongly suggests, however, that the "this" in Carey's answer refers to contributions from non-IBT union officials, made to the Carey campaign in 1996. *See* Indictment at 33–34. At the very least, the earlier testimony is sufficient to support a jury determination that the "this" in the answer refers to such contributions.

Furthermore, additional testimony that would clarify some of these terms is not included in the Indictment. For example, Carey complains that Specification (a) in Count Seven is fundamentally ambiguous based on the term "this" in his statement, "I don't recall ever discussing this with Monie." The government has submitted a transcript containing the testimony surrounding the statement. (Dember Aff. Ex. I.) That surrounding testimony suggests that the "this" refers to a memorandum allegedly submitted to Carey requesting the approval of a contribution of IBT funds.

 Because outside evidence may serve to illuminate the meanings of these facially ambiguous terms, striking the specifications at this point is inappropriate. The pronouns at issue here differ from the phrase "follower of the Communist line" found in *Lattimore*. The meanings of pronouns such as "this," "that," "those," etc. can generally be elucidated by implication from the surrounding text. This is not the case with a phrase such as "follower of the Communist line" that virtually requires an explicit definition.[18] The court has consid-

---

18. This conclusion is also supported by the Second Circuit's decision in *Lighte,* 782 F.2d

ered Carey's specific arguments with regard to fundamental ambiguity and finds them to be without merit or, at the very least, premature. Carey is free to renew his motion to strike certain specifications after the close of the government's case.

*(4) Defendant's Motion to Dismiss Counts One, Two, Five, Six and Seven for Failure to State an Offense*

Carey next moves to dismiss Counts One, Two, Five, Six and Seven for failure to state an offense. Each of these counts charges Carey with violating 18 U.S.C. § 1001 in two separate ways: (1) by making false statements and representations and (2) by concealing material facts. Carey argues that the government has failed to allege sufficient facts to support the concealment prong.

The court need not address this issue in detail because the government consents to striking the concealment language in each count. Except for his argument discussed in the previous section, Carey does not contend that the government has failed to allege facts sufficient to support these counts under the first prong (i.e. making false statements and representations). Therefore, Carey is not entitled to dismissal of the entire counts.

*(5) Defendant's Motion to Strike Surplusage*

■ Defendant next moves to strike as surplusage certain language in the Indictment. Rule 7(d), F.R.Crim. P., provides that "[t]he court on motion of the defendant may strike surplusage from the indictment...." It is appropriate to grant a motion to strike language "where the challenged allegations are not relevant to the

crime charged and are inflammatory and prejudicial." *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996) (quotations omitted).

Carey urges the court to strike all of paragraph 29 from the Indictment. That paragraph refers to the investigations by the elections officer and the IRB and the results of those proceedings. The government has consented to striking two sentences in this section: 1) "The Election Officer subsequently disqualified Carey from the rerun election"; and 2) "Following the hearing, the IRB expelled Carey from the union and barred him from ever holding union office or employment."

Carey is not entitled to have any other language from paragraph 29 stricken. The fact that the election officer and the IRB were investigating whether Carey knew about improper campaign contributions is entirely relevant to the perjury and false statements prosecution. All of the charges in the Indictment require the government to prove that any false testimony provided by Carey was "material" to the inquiry being conducted. *See United States v. Regan,* 103 F.3d 1072, 1081 (2d Cir.1997). Without discussing the purpose of the various interrogations, it would be impossible to determine whether Carey's allegedly false testimony was material.

Carey next argues that any allegations relating to organized crime should be stricken as irrelevant. The government counters that the corruption of the union by organized crime is relevant both to provide historical context and to demonstrate that Carey was motivated to remain in control of the union to prevent the

367. There, the court ruled that questions that used the term "you" without clarifying whether it referred to the witness individually or to his capacity as a trustee were fundamentally ambiguous. *Id.* at 375–76. The court

based its decision upon the fact that the surrounding testimony did not clarify the term, thereby implying that context is relevant in resolving ambiguities. *Id.* at 376.

reinfiltration of organized crime. The government can fulfill these objections by simply noting that historically there was corruption within the union. There is no need for inflammatory phrases such as "La Cosa Nosta." It is virtually inevitable that references to organized crime will permeate this trial through the various witnesses and exhibits. This is no justification, however, for the unnecessary inclusion of such terms in the Indictment. The court therefore orders the government to strike any reference to organized crime and "La Cosa Nostra" in the Indictment.[19]

Finally, Carey contends that certain characterizations of the "swap scheme" should be stricken. The court agrees that the description of the scheme as unlawful in the section heading on page eight of the Indictment is irrelevant and prejudicial, and therefore should be stricken or modified. Carey is charged with perjury and making false statements regarding his knowledge of certain IBT contributions and the scheme by which those contributions may have aided his campaign. It is irrelevant whether that scheme was unlawful. The risk that such a label might prejudice the defendant is unwarranted. Carey's other complaints that the "swap scheme" should not be characterized as a "quid pro quo" (Ind.¶ 22) or as a "scheme" (Ind.¶ 24) are without merit. It is difficult to identify another way in which it could be described.

### (6) Defendant's Motion In Limine to Exclude Evidence

Carey also moves *in limine* pursuant to Rule 403, F.R. Evid., to preclude the government from introducing any evidence that Carey was disqualified from the IBT rerun election by the election officer and expelled and barred for life from the IBT

by the IRB. He contends that the probative value of such evidence is outweighed by the danger it poses of unfair prejudice. The government states that it is willing to forego introducing evidence as to these matters on the condition that Carey agree not to offer such evidence himself, through cross examination of government witnesses or through direct examination of his own witnesses. The government adds that if the defendant fails to abide by this condition, it will feel free to introduce such evidence as well. The defendant has indicated his approval of this proposal in his reply papers. The court accepts this arrangement with one caveat: To avoid misunderstanding during trial, if there is any possibility that there could be disagreement as to what constitutes "opening the door" in this context, it is suggested that the parties reach agreement on the parameters of that issue before trial.

### (7) Defendant's Motion for a Bill of Particulars

 Finally, the defendant moves for a bill of particulars. Carey concedes that he has been notified as to which of his statements the government believes are false or misleading. Nevertheless, he contends that with certain testimony, there is such ambiguity that he does not know in what respect the claim of falsity is made, why the government claims the statements are false and from what sources the government will seek to establish their falsity. He asserts a need and a right to be advised of these matters along with various informative details to assist him in preparation for trial. Rule 7(f), F.R.Crim. P., provides that, on motion, the court "may direct the filing of a bill of particulars." Whether to order the filing of a bill of

---

19. Carey also urges the court to strike any references to "Racketeering" and the RICO Act on page four of the Indictment. Such language, however, is relevant to provide context for the Consent Decree and is not overly prejudicial to the defendant.

particulars rests in the sound discretion of the district court. *See United States v. Barnes,* 158 F.3d 662, 665–66 (2d Cir.1998). That determination is based upon the totality and specificity of the information available to the defendant. *See United States v. Bin Laden,* 92 F.Supp.2d 225, 233 (S.D.N.Y.2000) (Sand, J.).

█ Carey primarily seeks particulars regarding two types of information. First, he contends that the government should be required to disclose on what basis it believes his statements are actually false or perjurious. In this context, he argues that several questions in the Indictment are compound and it is unclear in what respect the government contends that his answers are false.

█ As a preliminary matter, Carey does not cite a single case from this jurisdiction—and the court is unaware of any— in which the government has been required to disclose its theory before trial as to why a particular statement is false. A perjury or false statements indictment need not provide notice of the actual "truth." *See United States v. Gregory,* 611 F.Supp. 1033, 1039 (S.D.N.Y.1985) (Weinfeld, J.). Most courts that have addressed the issue of a bill of particulars in a perjury prosecution have been satisfied where the defendant is provided notice of the actual statements which are allegedly perjurious. *See, e.g., Bin Laden,* 92 F.Supp.2d at 243 (noting that government's voluntary identification of allegedly false statements provided satisfactory notice to defendant to defend perjury and false statements prosecution); *United States v. Burke,* 87 Cr. 0703(DNE), 1988 WL 6217 *1 (S.D.N.Y. Jan. 7, 1988) (Brieant, J.) (denying motion for bill of particulars where indictment contained "answers in which the defendant is alleged to have perjured himself and the questions that precipitated those answers"); *United*

*States v. David,* 86 Cr. 454(JFK), 1986 WL 13805 *3 (S.D.N.Y. Nov.21, 1986) (Keenan, J.) (same). In this case, the government has provided such notice. In requesting disclosure of the basis for the government's belief that the statements charged in the Indictment are false, Carey is asking the government to reveal the legal theory on which it will proceed. Defendant is not entitled to that. *See United States v. Facciolo,* 753 F.Supp. 449, 451 (S.D.N.Y.1990) (Edelstein, J.). *See also United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990).

Furthermore, even though some of the questions listed in the Indictment may be compound, this is not a situation in which Carey lacks notice of how the government will proceed. Even assuming the government has alternatives in demonstrating falsity, those alternatives are identifiable. Indeed, Carey's argument has been rejected specifically by this court. *See United States v. Ruiz,* 702 F.Supp. 1066, 1070–71 (S.D.N.Y.1989) (Leisure, J.) (denying a motion for a bill of particulars in a false statements prosecution where it was unclear in which of two alternative ways the defendant's statement was false), *aff'd,* 894 F.2d 501 (2d Cir.1990). Furthermore, as discussed supra, the court anticipates that, to the extent certain questions are compound, Carey may argue that his answer must be proven false with respect to each of the various elements of the question.

The second type of information about which Carey seeks particulars is the source of the government's allegation of falsity. He notes that several questions in the Indictment ask whether he had conversations with "anyone" regarding certain contributions. He contends that such sweeping statements provide him virtually no notice of what evidence may be used to support the government's allegations.

Carey concedes that he has been provided access to extensive documentary evidence, but complains that the volume of that evidence renders it virtually useless.[20] Indeed, the Second Circuit has noted that providing an enormous amount of materials may, in and of itself, be a legitimate justification for a bill of particulars. *See, United States v. Bortnovsky,* 820 F.2d 572, 574–75 (2d Cir.1987). *See also Bin Laden,* 92 F.Supp.2d at 234. However, the length of time that the defendant has to review the material is also relevant to this analysis. In *Bortnovsky,* for example, the defendant's counsel had only four days to sort through over 4,000 documents. 820 F.2d at 574–75.

In this case, defense counsel will have had access to these materials for months before trial. Furthermore, the government has volunteered to provide a list of the witnesses it plans to call, the order in which they will be called and relevant Jencks Act (18 U.S.C. § 3500) materials two weeks before trial. Additionally, there have been several prior proceedings involving many of the matters of relevance to this case. These include various administrative proceedings and the trial of IBT Governmental Affairs Director William Hamilton. Carey therefore already possesses unusual insight into the government's trial strategy. The court is convinced that the Indictment and the pretrial disclosures by the government provide sufficient information for Carey to prepare a meaningful defense.

## CONCLUSION

For the foregoing reasons: (1) defendant's first motion to dismiss Counts 1, 5, 6 and 7 for improper venue is denied; (2) defendant's second motion to transfer this case for trial to the United States District Court for the District of Columbia is denied; (3) defendant's third motion to dismiss Counts 1, 3, 4, 5, 6 and 7 for failure to state an offense is denied, except that the following specifications will be stricken: Specification (d) in Count 1; Specifications (d), (*l*), (p), (q) and (s) in Count 3; Specifications (i) and (k) in Count 4; and Specification (c) in Count 7; (4) defendant's fourth motion to dismiss Counts 1, 2, 5, 6 and 7 is moot; (5) defendant's fifth motion to strike surplusage is granted in part and denied in part; (6) defendant's sixth motion *in limine* to exclude certain evidence is moot; and (7) defendant's seventh motion for a bill of particulars is denied.

**IT IS SO ORDERED.**

---

**20.** It is dubious that the defendant actually will be prejudiced by this large document production. Despite the volume of documents, defendant's counsel has apparently been successful in identifying relevant information. (Bishop Aff. ¶ 30.)